### WICKER v. BATON ROUGE MUT. BEN. ASS'N.

#### No. 1532.

Court of Appeal of Louisiana, First Circuit.

Dec. 9, 1935.

Fred G. Benton and Carlos G. Spaht, both of Baton Rouge, for appellant.

Taylor, Porter & Brooks, of Baton Rouge, for appellee.

DORE, Judge.

The plaintiff in this action, Mrs. Edna Loudon Wicker, is the widow of Henry D. Wicker, and she sues the defendant, Baton Rouge Mutual Benefit Association, for certain death benefits, alleged to have accrued to her by virtue of her husband's membership in said association, aggregating the sum of $1,871.

We gather, as a whole, that the attorneys for the plaintiff and the defendant do not differ materially as regards the controlling facts in the case, and since the defendant's brief seems to state the case as developed by the record, we shall excerpt the following from such brief:

"Henry D. Wicker was, until November 4, 1927, an employee of the Standard Oil Company of Louisiana. He was also a member of Baton Rouge Mutual Benefit Association, a mutual benefit association of employees of the Standard Oil Company organized and operated 'for the sole benefit of its members and not for' profit.' Each member of that organization is required to pay $1.00 per month into a benefit fund and also $1.00 upon the death of each member, the latter fund being used to pay death benefits to the beneficiaries of the deceased members. Applicants for membership are restricted to white employees between the ages of sixteen and forty-five of the Standard Oil Company. When a member leaves or is discharged from the Standard Oil Company he may, if he requests, be permitted by the board of directors of the Association to retain his membership therein.

"On November 3, 1927, Wicker killed a man and was immediately incarcerated in the parish jail at Baton Rouge. The next day, November 4, 1927, he was discharged from the employ of the Standard Oil Company, and on November 8, 1927, the defendant association dropped him as a member inasmuch as he was no longer an employee of the Standard Oil Company. Some time early in 1928 Wicker was acquitted of the crime of murder, and the Standard Oil Company, in order to permit him to participate in certain benefits, allowed only to employees who have been continuously in its service, on March 28, 1928, changed its records so as to show that Wicker had been granted a 'leave of absence' effective as of November 4, 1927, and re-employed him. He worked for the Standard Oil Company until May 5, 1931, when he ceased work on account of illness, from which he died on April 16, 1932.

"Under an agreement between the association and the Standard Oil Company the latter deducted from its employees payroll checks sums sufficient to pay the dues of its employees who were members of the association, and Wicker's dues were deducted from his last payroll check in November, 1927, thereby paying his dues in the association through that month.

"Thereafter Wicker paid no dues, and no death benefits, although he lived nearly five years thereafter, during which time approximately sixty members of the association died.

"Moreover, he was incapacitated for work on account of sickness for approximately fifteen months, i. e., from May 5, 1931, until August 16, 1932, and he neither asked for nor received any sick benefits, on account of said illness, and

"Finally, Wicker at no time, directly or indirectly, asked nor sought to be reinstated as a member of defendant association.

"On November 8, 1927, when Wicker was dropped as a member of the defendant association, he was more than fifty-one years old, having been born on February 14, 1871. He was, therefore, beyond the age limit fixed for members, i. e., between 16 and 45, and could not again become a member of the association.

"This suit was filed by the plaintiff, who was his widow, in which she sought to recover death benefits in the net amount of $1,871.00.

"The trial court dismissed plaintiff's demand and rendered judgment in favor of the defendant."

As before stated, the above material facts are practically conceded by the attorney for the plaintiff, and his position is well and succinctly stated in his brief thus:

"The only questions to be answered in arriving at the correct decision of the rights of these two litigants is, first: Was the assured properly expelled or dropped from the membership of the defendant association on November 8, 1927, and if not, is the theory on which the plaintiff is presently proceeding legally sound?

"Inasmuch as it is not necessary to go into the second question unless the first question is answered in the negative, let us first examine it and see whether or not the assured was legally expelled or dropped from the membership of the defendant.

"The power of the Board of Directors of defendant in this matter is controlled by the following provisions of the Constitution and by-laws:

"Article VII.
"Expulsion of Members.

"Sec. 1. Any member of the Association proven guilty of any offense against the laws of the State of Louisiana, or of conduct unbecoming a gentleman, may be expelled from the association by a majority vote of the Board of Directors.

"Sec. 2. Should a member leave or be discharged from the service of the Standard Oil Company of Louisiana, or subsidiary thereof, he may be permitted by the Board of Directors to still hold his membership in the Association as long as he resides in the State of Louisiana and complies with the provisions of the Constitution and by-laws of the Association.

"The defendant contends that the assured was discharged by the Standard Oil Company and that, therefore, under Section 2, above, it had a right to drop him from its membership."

The case is not without complexity, and because of the very thorough and learned arguments presented by counsel for both sides, we have undertaken a studious examination of the authorities cited in support of their respective positions before this court, and the evidence given in support thereof. The crux of the whole case resolves itself into two well-defined questions. First, Was the deceased, Wicker, "discharged from the service of the Standard Oil Company on November 4, 1927, the day after he committed a homicide and was incarcerated in the jail at Baton Rouge? Second, Did the circumstances of such discharge as subsequently developed justify the defendant association on the same day in dropping or expelling the said Wicker from membership and thereby excluding him from any of the benefits of the same? It is conceded that on November 4, 1927, the day after the alleged homicide, the records of the Standard Oil Company evidenced that he was discharged, and that he continued as a discharged employee from that date until the 29th day of March, 1928, when he was re-employed. It is further shown by the testimony of Mr. M. H. Edwards, the "personal manager" of the Standard Oil

Company, that the notation made on his employment card "11-4-27-discharged" was substituted with the words: "11-4-27, five months leave of absence," and that such latter notation, made after a line was drawn through the first notation, was made for the purpose of enabling Wicker to receive certain benefits from the Standard Oil Company that under its rules he would be entitled to by virtue of his length and continuity of employment, and obviously done as a matter of grace and protection to an old employee. Here is the testimony of this witness appearing at page 24 et seq. of the transcript:

"Q. Then I ask you again if the records of the Standard Oil Company of Louisiana do not show, reading them altogether, that Henry D. Wicker was between the dates of November 4, 1927, and the 28th of March, 1928, out of the employment of the Standard Oil Company because of being discharged? A. I would say the official records—calling for annuity and benefits—do not at this time show him to be discharged.

"Q. Why do they not? A. To protect his service for the company which has to be continuous to qualify for the various plans of the company. That discharge was cancelled and this leave of absence put in to care for his continuous service, to restore him to full benefits.

"Q. Then the company restored Mr. Wicker retroactively from the 28th of March, 1928, to the date he had originally been discharged, November 4, 1927? A. I think that is correct.

"Q. Between these dates he was not in the employ of the Standard Oil Company? If some one had searched your records during that time, the records would show him to be a discharged man between the dates of November 4, 1928, and March 28, 1928? A. Yes.

"Q. That is the reason why the penmark appears drawn through the third line on this envelope where the word 'discharged' appears and on the next line with the same date there is a contrary statement? That is correct, is it not? A. According to that, yes.

"Q. Then I ask you again if the fourth line on the outside of the manila envelope where 'five months leave of absence' appears was not written on there on the 28th of March, 1928, rather than on the 4th of November, 1927, as it appears to have been? A. Yes.

"Q. And your whole motive for making the change was to help restore Mr. Wicker to the benefits? A. Yes, sir.

"Q. When you say you did this in order to restore Mr. Wicker to certain benefits, did you have reference at all to the Baton Rouge Mutual Benefit Association? A. No, sir.

"Q. That, as I understand it, Mr. Edwards, is a private, independent organization that the Standard Oil Company has nothing to do with except as it may care to cooperate with it? A. Yes."

We think the defendant association was fully justified in acting on the records of the Standard Oil Company, and which, without any explanatory statement whatever, showed that Wicker was discharged from its service on November 4, 1927. The association elected to invoke its regulation, and its board of directors on November 8, 1927, was furthermore justified in entering the following on its minutes:

"Mr. H. D. Wicker being no longer an employee of the Standard Oil Company, was dropped from the roll of the B. R. Mutual Benefit Association."

It was not until March 28, 1928, that the deceased was re-employed by the Standard Oil Company when the notation was made on its books, and for the purposes already adverted to, that instead of being discharged Wicker had been granted a leave of absence. There is no proof that Wicker ever paid any dues after November, 1927, and, on the contrary, it is shown that the last deduction made from his pay roll check for dues in the association was November, 1927. Certainly there came no protest or remonstrance from him as to his expulsion from the association between the dates of November 8, 1927, and August 16, 1932, when he died. No application for reinstatement, no complaint, and no payment of dues during a period of over four years came from Wicker. It would seem improbable that under these circumstances he considered himself entitled to any benefits from the association. He had been a member of the association since 1924, and presumably knew its rules and regulations. He knew, without doubt, that he had paid no dues or assessments during a period of over four years, because such dues or assessments, under the practice uniformly obtaining, were deducted from his salary checks by the Standard Oil Company.

True, plaintiff made a feeble attempt to prove that there had been some movement in the direction of reinstating Wicker in the association, and that emissaries from Wicker had discussed the matter with Allen, secretary-treasurer of the defendant association. Mr. Allen states that a Mr. Smith, Wicker's foreman, came to him "shortly after Mr. Wicker was reinstated at the plant" and asked him, "What about Wicker's mutual?" Allen's reply to this query was that Wicker had been dropped, that he was over the age limit and could not be reinstated, but that he could apply to the board of reinstatement, which he never did. Mr. Smith did not testify because he was either deceased or had left for parts unknown. Allen says that he did not consider Mr. Smith's query in any sense an application on the part of Wicker for reinstatement, and that he viewed the conversation in question merely as a friendly gesture on the part of Smith. Aside from this unimportant incident respecting any movement for reinstatement on the part of Wicker, it is apparent that he was an old employee of the Standard Oil Company and a member of the association since 1924, or thereabouts, and it is passing strange that he did not himself investigate his status during a period of over four years, when he knew that he was paying no dues and that he was not a member in good standing. We think this discussion and our findings in the premises would dispense from further discussion as to whether Wicker was rightfully or wrongfully taken from the rolls of the association.

The citations of authority in the brief of counsel for the plaintiff in this case undoubtedly are to the effect that an authorized or illegal cancellation of an insurance policy, or even a membership in a mutual benefit association, would have no binding effect on the assured or member, but in this case we have concluded that the cancellation of Wicker's membership in the defendant association was fully justified under the circumstances. The trial judge was called upon to pass upon the facts of this case, and while the issues do present mixed questions of fact and law, we have arrived at the conclusion that his judgment is correct. It is, therefore, ordered that the judgment of the lower court be and the same is hereby affirmed.